**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

UNITED STATES OF AMERICA,

Plaintiff, CASE NO. 26-20181-CR-ALTMAN

v.

TRENTON RICHARD DAVID JOHNSTON,

Defendant.
______________________________________/

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD VARIANCE**

Defendant Trenton Johnston respectfully submits this memorandum in advance of his sentencing, set for October 26, 2026. Mr. Johnston pleaded guilty to Count Two of the Indictment, which charged him with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). The parties agreed to an offense level of 24 after acceptance of responsibility and an advisory guideline range of 51 to 63 months. On October 21, 2026, the government moved under U.S.S.G. § 5K1.1 for a 40% reduction of Mr. Johnston's sentence. ECF No. 69. For the reasons set forth below, the defense respectfully asks the Court to impose a sentence of 18 months' imprisonment, which is sufficient, but not greater than necessary, to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).[1]

---

[1] Under the Court's Order Setting Sentencing Procedures, motions for variances were due fourteen days after disclosure of the draft PSR. ECF No. 60. The plea agreement likewise contemplates a written variance request by that deadline, "subject to any extension of time agreed upon between the parties or ordered by the Court." Plea Agreement ¶ 13 (ECF No. 48). Undersigned counsel has conferred with the United States, which does not oppose the timing of this motion. Good cause supports leave to file it now. The Court continued sentencing at the parties' joint request so that "ongoing matters that may bear upon the appropriate disposition of this case" could be resolved, ECF

Mr. Johnston does not minimize his conduct. He participated in a scheme that socially engineered unwitting victims into turning over the keys to their cryptocurrency wallets. He and others involved in the scheme then spent the money and flaunted their ill-gotten gains. The record contains statements by him that are crude, callous, and deeply embarrassing. But Mr. Johnston quickly admitted his conduct and is tremendously sorry for what he has done. He asks the Court to sentence him as a whole person, a then-teenager, now twenty years old, who took a deeply disturbing turn but has taken every step available to him to make amends, and not merely the person reflected in the record before the Court.

Mr. Johnston was a teenager when the broader course of conduct began. He was, by his own account and that of his family, deep in addiction and immersed in an online subculture that rewarded exactly the behavior that brought him here. Since his arrest he has taken responsibility in the most concrete ways available to him: before he even pleaded guilty, he turned over all of the stolen cryptocurrency in his possession, approximately $3.8 million, to be applied to restitution; he has cooperated with the government; he has incurred no disciplinary infractions; and he has expressed genuine remorse. He is a twenty-year-old with no prior convictions who will be removed to Canada at the end of his sentence and will likely be barred from returning to the United States.

Three features of this case, taken together, make an 18-month sentence appropriate.

*First*, Mr. Johnston's acceptance of responsibility, his cooperation, and his surrender of all the stolen cryptocurrency in his possession distinguish him from the ordinary money-laundering defendant.

---

Nos. 67, 68, and the government filed its § 5K1.1 motion today, ECF No. 69. As such, Mr. Johnston respectfully requests leave to file this motion today.

*Second*, Mr. Johnston's youth substantially reduces his culpability and heightens his prospects for rehabilitation. He has a home, a job waiting for him in his father's auto shop, and an apprenticeship offer waiting for him once he has completed his sentence. His age is a mitigating consideration the Sentencing Commission has recently and expressly endorsed.

*Third*, because Mr. Johnston is subject to a final order of removal, he will serve his sentence under materially harsher conditions, and for materially more time, than a citizen. He is ineligible for the First Step Act credits, the camp placement, and the community re-entry that shorten a citizen's actual time in custody, and he faces additional immigration detention afterward. The same sentence is therefore materially more severe for him than for a citizen, an added real-world severity the Court should weigh in determining just punishment under § 3553(a)(2)(A).

There is more to Mr. Johnston than the conduct in this record. His family has stood by him with full knowledge of what he did, and those closest to him have written to the Court on his behalf. *See* Ex. A (Letters in Support). A home and a trade already await him in the country to which he will be removed. PSR ¶ 105; Ex. A. Mr. Johnston has strived to correct the mistakes of his past and is a young man with a future. We respectfully ask the Court to weigh all of this while fashioning its sentence.

## I. PROCEDURAL POSTURE AND THE GUIDELINE CALCULATION

On June 9, 2026, Mr. Johnston pleaded guilty to Count Two of the Indictment, conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), pursuant to a written plea agreement. PSR ¶ 1. He has been in continuous custody since his arrest on March 24, 2026, and has been held at the Federal Detention Center in Miami since April 24, 2026. Factual Proffer at 4 (ECF No. 49); PSR ¶ 76. Sentencing is set for October 26, 2026. ECF No. 68.

The plea agreement sets forth an agreed upon offense level of 24 after acceptance of responsibility, a criminal history category of I, and an advisory range of 51 to 63 months. Plea

Agreement ¶¶ 7–9 (ECF No. 48). The Presentence Investigation Report ("PSR") instead calculates a total offense level of 28 and a range of 78 to 97 months. PSR ¶ 139. The defense submitted written objections to the Probation Office, which remain unresolved, and preserves them here. *See* PSR Addendum (ECF No. 66-1).

In brief, the defense objects that (1) the report applies both a sophisticated-means enhancement under U.S.S.G. § 2B1.1(b)(10)(C) and a sophisticated-laundering enhancement under § 2S1.1(b)(3), where the parties agreed to a single sophistication enhancement and both rest on the same conduct;[2] (2) the report applies the 2025 Guidelines Manual loss table, under which the loss yields a 20-level increase, rather than the inflation-adjusted table the parties agreed to apply, under which it yields an 18-level increase; and (3) the statutory maximum is ten years, not twenty, because the sole object of the conspiracy was a § 1957 offense. *See* Plea Agreement ¶¶ 1, 4. Under amendments that take effect November 1, 2026, a loss of more than $5,000,000 but not more than $15,000,000 produces an 18-level increase. U.S.S.G. § 2B1.1(b)(1)(J) (eff. Nov. 1, 2026); *see* U.S. Sent'g Comm'n, *Amendments to the Sentencing Guidelines* 27–28 (Apr. 30, 2026). Mr. Johnston's $13,041,000 loss falls in that amended bracket (+18); under the 2025 Manual the same loss falls in the "more than $9,500,000" bracket (+20).

The Court need not resolve every objection to grant the relief requested. Whatever the advisory range, the § 3553(a) factors call for a sentence well below it. Probation applied the 2025 loss table because § 1B1.11 directs use of the Manual in effect on the date of sentencing. PSR ¶ 141. The defense does not ask the Court to apply two Manuals. It asks the Court to account, as a variance, for

[2] The stipulated calculation may itself contain an error, though one that does not change the result. Section 2S1.1(b)(3) applies only if "subsection (b)(2)(B) applies," and subsection (b)(2)(B) "shall not apply if the defendant was convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957." U.S.S.G. § 2S1.1(b)(3) & cmt. n.3(C). The sole object of this conspiracy was a § 1957 offense. Plea Agreement ¶ 1. The Probation Office itself applied § 2S1.1(b)(2)(A) for a § 1957 conviction. PSR ¶ 86. If the parties' single sophistication enhancement rests instead on § 2B1.1(b)(10)(C), the offense level remains 24 and the range remains 51 to 63 months. Under either route, only one two-level sophistication enhancement applies, and the PSR's application of both is error.

the Commission's own judgment that the current table overstates harm: because of inflation, "monetary losses in current offenses reflect, to some degree, a lower degree of harm and culpability than equivalent amounts when the monetary tables were last substantively amended." *Amendments to the Sentencing Guidelines*, *supra*, at 27. Mr. Johnston will be sentenced six days before that judgment takes effect. The defense asks the Court to begin from the parties' agreed range of 51 to 63 months. Applying the government's requested 40% reduction to that range yields 30.6 to 37.8 months. *See* ECF No. 69. The defense asks the Court to vary from there to 18 months.

## II. THE OFFENSE CONDUCT AND MR. JOHNSTON'S ACCEPTANCE OF RESPONSIBILITY

Mr. Johnston accepts full responsibility for his conduct. He is deeply ashamed of what he has done and remorseful for the harm he caused the victims, for his behavior while in the United States, and for the shame he has brought upon his family and community. From in or around January 2024 through March 2026, he and others used social engineering, impersonating technical-support and cryptocurrency-exchange representatives, to induce victims to give up access to their cryptocurrency, and the proceeds were then laundered by moving them through cryptocurrency wallets and into vehicles, rentals, jewelry, and other goods. PSR ¶¶ 25–73. The harm was real, and for at least one victim it was devastating: the theft of 185 bitcoin took what that victim described as his life savings. PSR ¶ 43. Mr. Johnston does not ask the Court to look past that. He is not proud of what he has done, but he is hopeful that the steps he has taken, and will continue to take, work towards righting his wrongs.

His acceptance of responsibility has been immediate and concrete. On June 4, 2026, before he entered his guilty plea, he turned over approximately 53.16 bitcoin and 275.23 ether, approximately $3.8 million in value and, as the government has stipulated, "the total amount of stolen cryptocurrency that he possessed from the fraudulent scheme." Factual Proffer at 4 (ECF No. 49); PSR ¶ 75. Those assets will be liquidated and applied to restitution. Plea Agreement ¶ 15. This was a complicated

process. As the government is aware, Homeland Security Investigations had previously tried, without success, to access the Trezor hardware wallet that held the funds. Mr. Johnston walked agents through the process of opening the wallet and assisted them in transferring the proceeds from a wallet he controlled to a wallet controlled by law enforcement. Unlike the seizure of a bank account, which requires only legal process and a cooperating financial institution, this recovery necessarily required Mr. Johnston's assistance to complete.

He agreed to the liquidation of additional assets, including a designer handbag and $16,362 in cash seized at his March 24, 2026 arrest, for application to restitution. PSR ¶ 75; Plea Agreement ¶ 15. He entered an early guilty plea, stipulated to the factual proffer, and has incurred no disciplinary infractions in custody. PSR ¶ 11. And he told the Probation Officer, in his own words, that he is "deeply sorry," that his conduct is "not a true reflection of who I am," and that he is "committed to assisting with the return of the assets stolen from the victims." PSR ¶ 84. Surrendering everything in his possession before even pleading guilty is not the norm; it reflects a young man genuinely trying to make his victims whole.[3]

## III. MR. JOHNSTON'S BACKGROUND AND CHARACTER

**Upbringing and family.**

The Court sentences the whole person, not the worst thing he has done, and the person before the Court is a twenty-year-old with an intact, supportive family and a concrete plan for a lawful life. Mr. Johnston grew up in Canada, in what he and his family describe as a stable home free of abuse. PSR ¶¶ 106, 108. His father is a mechanic and his mother a hair stylist; both live in Canada and remain in good health. PSR ¶ 106. His parents and siblings know about the underlying conduct in this case,

[3] The PSR recounts messages in which Mr. Johnston boasted that a cousin in Canada held his money. PSR ¶¶ 65–66. That was bravado. There is no such money, as Mr. Johnston has confirmed to the government.

and all of them remain supportive. PSR ¶¶ 106, 107; Ex. A. He graduated from secondary school and is skilled in computers. PSR ¶¶ 125–126. He has no prior juvenile adjudications or adult convictions and qualifies as a Zero-Point Offender. PSR ¶¶ 94, 96–98.[4]





*Trenton Johnston, growing up in Canada.*

**The people who know him.**

The people who have known Mr. Johnston his whole life have written to the Court, and they describe a young man the offense record does not capture. See Ex. A (Letters in Support)[5]. His mother, who was there when he took his first steps and drove his first car, remembers the boy who helped his great-grandmother with puzzles and built fence panels for the family's chickens. She does not excuse

[4] Two Miami-Dade matters remain pending: a 2025 reckless-driving traffic citation and a possession charge arising from the March 24, 2026 traffic stop that led to the charges in this case. That state court charge involves amphetamine pills located in a bag. Mr. Johnston disputes certain aspects of the state court allegations, none of which impact his acceptance of responsibility here. PSR ¶¶ 100–101.

[5]The letters are filed in redacted form. To protect Mr. Johnston and the family members who have written on his behalf, identifying information, including names, business names, and specific place names, has been redacted. Unredacted copies have been provided to the Court and the government.

what he did; she writes that her son "has made mistakes," and she asks only that the Court "give him the opportunity to learn from his mistakes, grow and move forward." She tells the Court that "his best days can still be ahead of him." Ex. A (Letter of the Defendant's Mother). His older sister, who watched him grow "from a little boy who loved Tonka trucks and playing LEGO," writes that he "values his family and genuinely cares about the people closest to him" and was "a huge source of support" when she had her first child. Ex. A (Letter of the Defendant's Sister).

Those who have worked beside him describe discipline and effort, and they vouch for his capacity to change. His brother-in-law, who has known him since he was about thirteen, writes that on the jobsite he has "seen him work hard, take on responsibilities, and work through problems," and calls him a "caring, hardworking, humorous" young man. He believes Mr. Johnston is "capable of learning from" his mistakes and "making better decisions moving forward," and that he will "take this experience seriously, accept responsibility, and continue moving in a positive direction." Ex. A (Letter of the Defendant's Brother-in-law).

**A home and a trade waiting for him.**

Most concretely, Mr. Johnston has a home and a livelihood waiting for him in Canada, the country to which he will be removed. His father, a licensed auto body technician, writes that his son has "a loving home to come back to and live, a fully functional auto shop," where the father will help him "gain knowledge and experience working on vehicles to start his career"; Mr. Johnston has already completed a beekeeping course and will help run the family apiary. Ex. A (Letter of the Defendant's Father). And a family friend who owns his own automotive shop has offered Mr. Johnston a formal apprenticeship, writing that he is "thrilled to offer him the opportunity" and that there is "a real need for trades people." Ex. A (Letter of a Family Friend). His mother has likewise confirmed to the Probation Office that he can live with her upon release. PSR ¶ 105. This is not a defendant with nowhere to go. It is a young man with a supportive family, a lawful trade, and a place in a community,

all waiting on the other side of his sentence and his removal to Canada. That is itself a reason a lengthy term of imprisonment is unnecessary to protect the public or to rehabilitate him.

**Addiction and a path to treatment.**

The PSR documents severe, escalating substance abuse. Mr. Johnston reported daily heavy alcohol use, daily marijuana use, and frequent cocaine and ecstasy use in the period leading to his arrest. PSR ¶¶ 116–122. He was diagnosed with ADHD at age eight and reported substituting street stimulants for his prescribed medication. PSR ¶¶ 115, 123. The Probation Office found that he "would benefit from substance abuse treatment." PSR ¶ 124. Addiction of this magnitude does not excuse the conduct, but it helps explain how a teenager spiraled into it and identifies a concrete rehabilitative need. The Commission itself has identified "substance use" as one of the risk factors that "may affect a youthful individual's development into the mid-20's." U.S.S.G. § 5H1.1 (2024). The defense respectfully requests a judicial recommendation for substance-abuse treatment, including the Residential Drug Abuse Program, during any period of confinement. *See* 18 U.S.C. § 3553(a)(2)(D).

## IV. LEGAL STANDARD

The Guidelines are "effectively advisory," *United States v. Booker*, 543 U.S. 220, 245 (2005), and "the starting point and the initial benchmark" but "not the only consideration," *Gall v. United States*, 552 U.S. 38, 49 (2007). The Court must make "an individualized assessment based on the facts presented," *id.* at 50, and impose a sentence "sufficient, but not greater than necessary," to comply with § 3553(a)(2). 18 U.S.C. § 3553(a). The weight given any particular § 3553(a) factor is "a matter committed to the sound discretion of the district court." *United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009); *accord United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015).

A sentence outside the range does not require "extraordinary" circumstances, and a reviewing court may not use "a rigid mathematical formula" keyed to the size of the variance; the justification

need only be "sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 47, 50. Congress has further directed that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person" that the Court may consider at sentencing. 18 U.S.C. § 3661. The Court must therefore have "the fullest information possible concerning the defendant's life and characteristics," because "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

This framework governs each argument below. Effective November 1, 2025, Amendment 836 deleted Chapter Five, Part H of the Guidelines Manual, including the former age policy statement at § 5H1.1, along with the departure provisions at §§ 5K2.0–5K2.24, while retaining § 5K1.1. The Commission was explicit that the change is "outcome neutral," and that judges "who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." U.S.S.G. ch. 1, pt. A, introductory cmt. (2025); *see* U.S.S.G. app. C, amend. 836 (eff. Nov. 1, 2025). The removal of departures "does not limit the information courts may consider in imposing a sentence." U.S.S.G. ch. 1, pt. A, introductory cmt. (2025). Everything that follows is offered as a variance under § 3553(a).

## V. A SENTENCE OF 18 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY

### A. Mr. Johnston's Cooperation with the Government Warrants Substantial Credit.

Mr. Johnston agreed to cooperate with the United States and has done so. The government has recognized that assistance by moving for a 40% reduction, ECF No. 69, a greater reduction than the 30% it seeks for his co-defendant, ECF No. 70. That difference is the government's own measure of the value of Mr. Johnston's assistance. His cooperation also bears directly on his history and characteristics under § 3553(a), and it reflects a genuine acceptance of responsibility and a willingness

to do the right thing. Undersigned is prepared to address the nature and extent of that assistance at sentencing.

**B. Mr. Johnston's Youth Substantially Reduces His Culpability and Supports a Reduced Sentence.**

The offense conduct began in January 2024, when Mr. Johnston was seventeen, and continued until March 2026, when he was nineteen. He is twenty today. PSR ¶¶ 79, 113. He was a teenager throughout. Although the law treated him as an adult for most of that period, the attributes of youth that make young offenders less culpable and more capable of change do not end at eighteen, and his youth is central to the § 3553(a)(1) analysis.

The Sentencing Commission has recently and expressly recognized youth as mitigating, and it did not draw the line at eighteen. Effective November 1, 2024, Amendment 829 revised the age policy statement to provide that "[a] downward departure also may be warranted due to the defendant's youthfulness at the time of the offense." U.S.S.G. § 5H1.1 (2024); *see* U.S.S.G. app. C, amend. 829 (eff. Nov. 1, 2024). The Commission explained that "[c]ertain risk factors may affect a youthful individual's development into the mid-20's," including "substance use"; that youthful individuals "generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood"; and that they "are more amenable to rehabilitation." U.S.S.G. § 5H1.1 (2024). Amendment 836 later deleted § 5H1.1 along with the other departure provisions, but it did so on an expressly outcome-neutral basis that leaves the Court free to give youth full weight as a § 3553(a) variance. *See United States v. Kaziu*, 768 F. Supp. 3d 477, 483–84 (E.D.N.Y. 2025) (reducing the sentence of a defendant whose radicalization began online at nineteen, relying in part on the 2024 amendment's recognition that youthful individuals continue to develop "into the[ir] mid-20's").

The Supreme Court's juvenile-sentencing decisions rest on the same reality. *Cf. Miller v. Alabama*, 567 U.S. 460, 472–73 (2012) ("the distinctive attributes of youth diminish the penological

justifications" for severe punishment); *Roper v. Simmons*, 543 U.S. 551, 569–70 (2005); *Graham v. Florida*, 560 U.S. 48, 68 (2010). Those decisions concern offenders under eighteen, but the attributes they describe, immaturity, impulsivity, and susceptibility to peer influence, do not disappear on an eighteenth birthday, as the Commission has now recognized.

Mr. Johnston's conduct bears the signature of that immaturity. The record reflects reckless bravado, including crude boasting in his messages, status-seeking within an online peer group, and impulsive spending, not the calculated planning of a mature offender. This does not excuse the behavior. However, it contextualizes the conduct, and it distinguishes Mr. Johnston from the older, entrenched launderer for whom a lengthy sentence is designed.

### C. Because of His Immigration Status, Mr. Johnston Will Actually Serve a Harsher and Longer Sentence, a Real Severity the Court Should Weigh Under § 3553(a)(2)(A).

Section 3553(a)(2)(A) requires a sentence that provides "just punishment for the offense." Whether a sentence is just depends on what it will actually require of the person who serves it. Here the answer is stark. Mr. Johnston is subject to a final order of removal entered April 15, 2026, before he pleaded guilty, which he does not contest. PSR ¶¶ 10, 111; Plea Agreement ¶ 22. Because of that status, he will serve far more of his sentence in secure custody than a citizen would, he will serve it in a higher-security institution, and he will spend additional time in immigration custody after it ends. The same term is, for him, a materially heavier sentence, and the Court may and should account for that added severity. These conditions also bear on the Court's obligation under § 3553(a)(6) to avoid unwarranted disparities, though the defense does not rest on that provision alone.

Every mechanism that shortens a citizen's time in secure custody, other than good conduct time, is closed to Mr. Johnston. Good conduct time under 18 U.S.C. § 3624(b) reduces any sentence by about fifteen percent, and it is available to him. A citizen's time is reduced further by First Step Act

time credits, which can take up to a year off the sentence; by a reduction of up to one year for completing the Residential Drug Abuse Program; and by transfer to a halfway house and home confinement for the final months. 18 U.S.C. §§ 3621(e)(2)(B), 3624(c), (g), 3632(d)(4).

A prisoner subject to a final order of removal is "ineligible to apply time credits" under the First Step Act. 18 U.S.C. § 3632(d)(4)(E)(i). He may earn them, but cannot apply them to his sentence. "Immigration and Customs Enforcement detainees" are not eligible for the early release available to those who complete the Residential Drug Abuse Program. 28 C.F.R. § 550.55(b)(1). And inmates assigned a "Deportable Alien" Public Safety Factor "shall not ordinarily participate" in community corrections programs, now known as Residential Reentry Centers. BOP Program Statement 7310.04, ¶ 10(b) (Dec. 16, 1998). Mr. Johnston does not dispute these decisions, nor does he ask the Court to restore a benefit Congress or the Bureau of Prisons has withheld. He asks the Court to consider what a term of imprisonment will actually mean for him. With only good conduct time available, Mr. Johnston will serve roughly eighty-five percent of his sentence, all of it in a secure institution, while a citizen with the same sentence who participates in programming will serve a substantially smaller share in secure custody and will likely finish the remainder in a halfway house or on home confinement. Thus, any given number of months imposed on Mr. Johnston carries more actual punishment than it would on a citizen. To illustrate the magnitude, a citizen sentenced to the bottom of the range that follows the government's motion, 30.6 months, could expect to spend roughly fifteen to eighteen months in secure custody before prerelease. An 18-month sentence here requires approximately fifteen months in secure custody, a comparable quantum of real punishment. The defense offers that figure not as a disparity the Court must mechanically erase, but as a concrete measure of how much heavier Mr. Johnston's time will in fact be.[6]

[6] The possibility of a transfer to Canada under the International Prisoner Transfer Program does not change this analysis. Undersigned has contacted the Canadian consulate regarding a transfer application. Transfer requires the consent of both governments, and applications take substantial time

*He will serve his sentence in a higher-security institution.* Because he is not a citizen, the Bureau of Prisons will assign Mr. Johnston a "Deportable Alien" Public Safety Factor, which requires that he "be housed in at least a Low security level institution." BOP Program Statement 5100.08, CN-3, *Inmate Security Designation and Custody Classification*, ch. 5, at 9 (May 6, 2026). A citizen with Mr. Johnston's offense and history would score in the Low range only because of the points assigned for his age, and the Bureau directs its staff to consider a "Lesser Security" management variable "where age is largely the contributing factor in the inmate's placement." *Id.* ch. 5, at 5–6. That path to a minimum-security camp is closed to Mr. Johnston. He will instead serve his time in a secure Federal Correctional Institution, among inmates serving longer terms for more serious offenses, where the Bureau's own data show higher rates of assault than at minimum-security camps. *See* Fed. Bureau of Prisons, *Prison Safety Statistics*, https://www.bop.gov/about/statistics/statistics_prison_safety.jsp (last visited Oct. 21, 2026) (assaults on inmates, by security level).

That placement weighs heavily on this defendant. Mr. Johnston is twenty years old and had never been incarcerated before this case. PSR ¶¶ 96–98, 113. A young first-time offender who, as a citizen, could expect consideration for camp placement will instead be housed with a more dangerous population for the entirety of his sentence. That added risk is a direct and foreseeable consequence of his status, and it bears on the just punishment this Court imposes. 18 U.S.C. § 3553(a)(2)(A); *see Kaziu*, 768 F. Supp. 3d at 484–85 (harsh conditions of confinement "amplify the retributive power of a sentence").

Furthermore, Mr. Johnston will serve additional time in custody after his criminal sentence ends. He will likely be transferred directly from the Bureau of Prisons to ICE custody to await physical removal.[7] For federal inmates who, like Mr. Johnston, already have a final order of removal, the

---

to process, so there is no assurance that any meaningful portion of a sentence of this length would be served in Canada.

[7] He may also be required to answer to the state court possession charge. *See supra* note 4.

Department of Justice's Office of the Inspector General found an average of twenty-three days in ICE detention. *See* Office of the Inspector General, U.S. Dep't of Justice, *Review of the Institutional Hearing and Removal Program Expansion for Federal Inmates* 20 (Sept. 2021). The period is modest, but it adds to the time he will serve in custody.[8]

Since *Booker*, the Eleventh Circuit has treated the question as one of discretion. In *United States v. Saac*, 632 F.3d 1203 (11th Cir. 2011), the defendant made the argument Mr. Johnston makes here: that his alienage rendered him "ineligible for certain vocational and other programs that could lead to early release and preclude[d] placement in a minimum security facility or home confinement." *Id.* at 1214. The court affirmed because the district court had considered that disparity argument in weighing the § 3553(a) factors, *id.* at 1215, and it expressly declined to decide whether *Maung* and *Veloza* remain binding after *Booker*, *id.* at 1215 n.6. The unpublished decisions in *United States v. Brown*, 433 F. App'x 708, 710–11 (11th Cir. 2011), and *United States v. Telles-Milton*, 347 F. App'x 522, 525 (11th Cir. 2009) (relying on *Maung*), likewise affirmed sentences in which the district court declined to vary on this

[8] The Eleventh Circuit's earlier decisions do not foreclose this argument. In *United States v. Veloza*, 83 F.3d 380, 382 (11th Cir. 1996), the court held that the collateral consequences of alienage could support a downward departure only if they were extraordinary in nature or degree, and affirmed a refusal to depart based on the unavailability of preferred conditions of confinement. In *United States v. Maung*, 320 F.3d 1305 (11th Cir. 2003), the court held that a sentencing court may not depart to shield a defendant from the collateral consequences of his alienage. Both were decided when the Guidelines were mandatory, and both asked only whether alienage justified a formal departure, not whether, in the discretionary weighing that *United States v. Booker*, 543 U.S. 220 (2005), and *Gall* now require, a court may consider the actual severity of the sentence it imposes. The Eleventh Circuit has since expressly declined to decide whether either decision survives *Booker*. *United States v. Saac*, 632 F.3d 1203, 1215 n.6 (11th Cir. 2011). *Maung* is further afield still. The defendant there was a lawful permanent resident, and the sentencing court had granted a departure to keep his conviction from counting as an aggravated felony and thereby preserve his eligibility for asylum and withholding of removal; the Eleventh Circuit reversed, holding that a sentencing judge may not manipulate a sentence to shield a defendant from the immigration consequences Congress has attached to his offense. *See Maung*, 320 F.3d at 1308–09. Mr. Johnston asks for nothing of the kind. He does not seek to avoid or alter his removal, he concedes it, and he does not ask the Court to reclassify his offense or to interfere with immigration policy. He asks only that the sentence reflect the real severity of the time he will serve, which bears directly on just punishment under § 3553(a)(2)(A).

basis. But those decisions reviewed sentences only for reasonableness. They hold that declining to vary is permissible, not that granting a variance is error, and they do not limit this Court's discretion. They also arose from illegal-reentry and drug cases whose circumstances bear little resemblance to a first offender who surrendered approximately $3.8 million before pleading guilty, cooperated with the government, and committed his offense as a teenager.

Courts in other circuits agree that a sentencing court may weigh these consequences. *See United States v. Thavaraja*, 740 F.3d 253, 262–63 (2d Cir. 2014) (affirming a below-Guidelines sentence over the government's challenge and holding that "a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family"); *United States v. Sanchez-Leon*, 764 F.3d 1248, 1263–64 & n.12 (10th Cir. 2014) (holding that the district court erred by refusing to consider deportability as a variance factor, and collecting cases); *United States v. Flores-Olague*, 717 F.3d 526, 535 (7th Cir. 2013) ("A sentencing court is well within its prerogatives and responsibilities in discussing a defendant's status as a deportable alien."); *United States v. Pacheco-Soto*, 386 F. Supp. 2d 1198, 1205–06 (D.N.M. 2005) (varying downward to mitigate the collateral consequences of deportable-alien status, and distinguishing illegal-reentry cases). The D.C. Circuit recently recognized the specific mechanism at issue here. *See United States v. Abukhatallah*, 181 F.4th 1276, 1291 (D.C. Cir. 2026) (recognizing that a court may reduce a deportable noncitizen's sentence because he is ineligible for home confinement under 18 U.S.C. § 3624(c), and that "a six-month departure is not uncommon" on that basis alone). *Abukhatallah* involved the loss of a single benefit. Mr. Johnston loses that benefit, First Step Act time credits, the Residential Drug Abuse Program reduction, and camp eligibility. *But see United States v. Rosado-Quijije*, No. 25-12314, 2026 WL 2529551, at *3 (11th Cir. Aug. 27, 2026) (per curiam) (stating, in an appeal from the denial of a § 3582(c)(2) motion, that the defendant's "immigration status is not relevant to an assessment of the § 3553(a) factors"). *Rosado-Quijije* does not control here. It is unpublished and

therefore not binding. 11th Cir. R. 36-2. The statement came in rejecting the district court's reliance on the defendant's likely deportation to *deny* him relief, and the panel grounded it in *United States v. Velasquez Velasquez*, which bars a court from imposing a harsher sentence based on "unfounded assumptions regarding an individual's immigration status or on [the judge's] personal views of immigration policy." 524 F.3d 1248, 1253 (11th Cir. 2008); *see Rosado-Quijije*, 2026 WL 2529551, at *3. Mr. Johnston asks the Court to rely on neither. He asks it to consider the concrete, documented conditions under which he will *actually* serve his sentence, the same argument the district court weighed in *Saac* and on which the Eleventh Circuit relied in affirming. 632 F.3d at 1214–15.

These consequences are concrete and foreseeable. They flow directly from Mr. Johnston's final order of removal and from the Bureau of Prisons' own written policies. The Court may account for them in its § 3553(a) analysis by imposing a sentence that reflects the real severity of the custody Mr. Johnston will actually serve.

The comparison is not hypothetical. Mr. Johnston's co-defendant, Brandon Tardibone, will be sentenced the same day. His plea agreement contemplates a range of 27 to 33 months, and the government has moved for a 30% reduction, which would yield 18.9 to 23.1 months. Plea Agreement ¶ 9 (ECF No. 51); ECF No. 70. Mr. Johnston was the more culpable participant, and the defense does not suggest otherwise. But Mr. Tardibone, who is on bond, will be eligible to surrender voluntarily, to seek designation to a camp, to apply First Step Act credits, and to finish his sentence in prerelease custody. Mr. Johnston will be eligible for none of those things. Measured in time actually spent in secure custody, an 18-month sentence for Mr. Johnston is likely to exceed what a sentence at the bottom of his co-defendant's reduced range will require of Mr. Tardibone.

**D. The Purposes of Sentencing Are Satisfied by the Requested Sentence.**

A sentence of 18 months, served under the conditions described above and followed by removal, reflects the seriousness of the offense, promotes respect for the law, and provides just

punishment. 18 U.S.C. § 3553(a)(2)(A). It affords ample specific deterrence: Mr. Johnston is a twenty-year-old with no prior convictions who has been in custody since March 24, 2026, surrendered approximately $3.8 million, cooperated, and will likely be barred from the United States for life. The defense recognizes that economic crimes are "prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quotation omitted). That purpose is served here by certainty, not length. Mr. Johnston was identified, arrested, and prosecuted; the stolen cryptocurrency in his possession was recovered; and he will leave prison with a federal felony conviction, a restitution judgment, and removal from the country. The offense involved no violence, and his removal reduces any need to protect the public through incapacitation. *See Sanchez-Leon*, 764 F.3d at 1264 n.12 (quoting *United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir. 2006)). A sentence paired with substance-abuse treatment best serves his correctional needs. 18 U.S.C. § 3553(a)(2)(B)–(D).

**E. The Court Should Impose No Fine and No Term of Supervised Release.**

The defense respectfully requests that the Court decline to impose a fine. Mr. Johnston has a net worth of zero, no meaningful assets, and no lawful income, and the Probation Office found that he "may not have the ability to pay a fine in addition to restitution." PSR ¶¶ 134, 137. The defense does not oppose restitution, toward which Mr. Johnston has already surrendered substantial assets.

Because Mr. Johnston is a deportable alien who will be removed at the end of his sentence, the Guidelines advise that the Court "ordinarily should not impose a term of supervised release" unless it "would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case." U.S.S.G. § 5D1.1(c) & cmt. n.9. Application Note 3's general recommendation of supervision for defendants with substance-abuse histories does not change that result; treatment conditions cannot be supervised in Canada, and the Probation Office's own proposed treatment condition applies only "[i]f not removed." PSR ¶ 176. The defense respectfully submits that no term of supervised release is necessary.

## VI. CONCLUSION

For the foregoing reasons, Mr. Johnston respectfully requests that the Court vary downward and impose a sentence of 18 months' imprisonment, with no fine and no term of supervised release, together with a judicial recommendation for substance-abuse treatment. The defense thanks the Court for its consideration.

Respectfully submitted,

DYNAMIS LLP
1 S.E. 3rd Avenue, Suite 1000
Miami, Florida 33131
(305) 306-6593

By: /s/ Brooke C. Watson
Brooke C. Watson
Fla. Bar No. 1074904
bwatson@dynamisllp.com
Counsel for Defendant Trenton Johnston

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve notice of electronic filing on all counsel of record.

/s/ Brooke C. Watson
Brooke C. Watson